UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| GARY A. CHRISTIANSEN, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 08-4013 |
| MICHAEL J. ASTRUE,<br>COMMISSIONER OF<br>SOCIAL SECURITY, | ) |
| Defendant. | ) |

**ORDER**

This matter is now before the Court on Plaintiff's Motion for Summary Judgment and the Defendant's Motion for Summary Affirmance. For the reasons set forth below, Plaintiff's Motion for Summary Judgment [#10] is DENIED, and the Defendant's Motion to Affirm [#11] is GRANTED.

**Background**

**Jurisdiction**

Plaintiff Gary Christiansen seeks judicial review of the final decision of Defendant Michael J. Astrue, the Commissioner of Social Security ("Commissioner") that he was not disabled within the meaning of the Social Security Act ("Act"). As Christiansen has exhausted his administrative remedies, the Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

**Procedural Background**

On August 26, 2005, Christiansen filed for disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging an onset date of disability of February 2, 2003. (Tr. 82, 85).[1] His insured status for DIB expired on March 31, 2003. (Tr. 89). The Agency denied his claim initially and on reconsideration. (Tr. 23-27A). Christiansen requested a hearing, and on January 12, 2007, he appeared with counsel before an administrative law judge ("ALJ"). (Tr. 52-53; 359-63). Both Christiansen and George Paprocki, a vocational expert ("VE"), testified at this hearing. (Tr. 326-358). At this hearing, Christiansen amended his disability onset to April 1, 2005, thereby waiving his DIB claim.

Following the hearing, the ALJ concluded that Christiansen was not disabled within the meaning of the Act. (Tr. 13-22). Christiansen requested review of the ALJ's decision by the Appeals Council. (Tr. 9). The Appeals Council denied review of the ALJ's decision on March 10, 2008, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-7). This appeal followed.

In his appeal, Christiansen argues that the ALJ erred in two respects: (1) that the ALJ's finding on the severity of his impairments was tainted by error and is not supported by substantial evidence; and (2) the ALJ erred by failing to

---

[1] Christiansen had previously filed a DIB application in 2003. (Tr. 131). On November 24, 2003, the state agency denied this application at the reconsideration level and Christiansen did not appeal this denial. (Tr. 131). Accordingly, this prior application is not before this Court for judicial review.

develop the record of treating source opinion evidence. The Court will address each argument after it summarizes the factual background of this action.

**Education/ work history**

Christiansen was 47 years old on the date of the hearing before the ALJ. (Tr. 330). He has a high school education and attended one year of college. (Tr. 112, 333). Christiansen has worked as a fork lift driver, painter, roofer, janitor, furnace installer, machinist, and laborer. (Tr. 118-22, 136, 349-350).

**Medical background**

In his 2005 disability application, Christiansen alleged he had "Probs w/ rt arm/ ankle- hepatitis- angina- depressed/ anxiety." (Tr. 135). The Court will only summarize and address the medical conditions that Christiansen discusses in his appeal, namely his injuries to his right wrist and right ankle and his depression and anxiety.

I.  <u>Right wrist and ankle</u>

On February 7, 2003, Christiansen fractured his right distal radius (wrist), when he slipped and fell. (Tr. 210). Peter D. Pardubsky, M.D. set the bone without surgery (closed reduction) and placed it into a cast. (Tr. 210). At an exam eight months later, Dr. Pardubsky noted that there was non-union of the distal radius that resulted in loss of reduction, dorsal inclination, and marked shortening. (Tr. 203). Dr. Pardubsky stated that Christiansen has some mild discomfort but it had dramatically improved since the previous exam. (Tr. 203).

On April 7, 2005, Christiansen returned to Dr. Pardubsky. (Tr. 202). At that visit, he told his doctor that he had been doing heavy work as a roofer and

3

noticed right wrist pain. (Tr. 202). Dr. Pardubsky noted that Christiansen's wrist continued to suffer from the distal fracture non-union and noted that surgery was an option. (Tr. 202). Dr. Pardubsky prescribed a one-time subscription for Tylenol #3 for his pain. (Tr. 202).

In January 2007, Dr. Pardubsky completed a physical functional capacity questionnaire at the request of Christiansen's attorney. (Tr. 316-21). Dr. Pardubsky noted that he had recommended Christiansen undergo surgery for his wrist but that Christiansen had failed to schedule this elective procedure. (Tr. 316). Dr. Pardubsky stated that he had seen Christiansen on eight occasions, during the period from February 2003, to April 2005, for his right wrist fracture malunion and pain. (Tr. 317). Dr. Pardubsky opined in his letter to Christiansen's attorney that that any use of Christiansen's right wrist caused severe, incapacitating pain and that if he had surgery, there was a risk that he could suffer from posttraumatic arthritis of the wrist. (Tr. 316).

In this questionnaire, Dr. Pardubsky noted that Christiansen was able to tolerate moderate stress and sit or stand for more than two hours at a time. (Tr. 318). In addition, Dr. Pardubsky indicated that Christiansen was able to sit, stand, and walk for at least six hours, did not need to shift positions between sitting, standing, and walking throughout the day, and would not need to take unscheduled breaks. (Tr. 319). Dr. Pardubsky stated that Christiansen was able to lift up to 20 pounds rarely, ten pounds occasionally, and less than 10 pounds frequently. (Tr. 319). Dr. Pardubsky found that Christiansen had no restrictions of overhead reaching or use of his left hand, and some limitation of grasping and

4

fine manipulation with his right hand and fingers. (Tr. 320). After making these observations, Dr. Pardubsky concluded that Christiansen was unable to do any job in the competitive workforce because he would be expected to miss more than four days of work per month. (Tr. 320). Dr. Pardubsky did not disclose the rationale for his conclusion or explain why he believed Christiansen would miss so much work.

On June 24, 2003, Stanley Rabinowitz, M.S., an examining physician, discussed Christiansen's fractured wrist and noted that it had not healed properly and needed orthopedic surgery for internal fixation and corrective osteotomy of the malunion. (Tr. 189). According to Dr. Rabinowitz, Christiansen had difficulty moving the right wrist and standing or walking for long periods, and difficulty kneeling or squatting, but that he was able to perform the usual activities of daily living. (Tr. 189). Dr. Rabinowitz noted that Christiansen walked with a mild right antalgic gait without the help of any assistive device; he had reduced right wrist flexion, but otherwise normal ranges of joint and spine motion; and that his grip strength and finger dexterity were normal in both hands. (Tr. 190-91). Dr. Rabinowitz further noted that Christiansen's neurological functioning, including motor strength, reflexes, and sensory responses, was normal in his arms and legs; that he was fully oriented in all spheres, had intact memory, appropriate appearance, no behavioral difficulties, and a normal ability to relate during the examination. (Tr. 191). In addition, Dr. Rabinowitz noted that Christiansen had fractured his right ankle when he was a teenager, which was treated with casting. (Tr. 189).

5

In December 2005, Roopa K. Karri, M.D., an examining physician, examined Christiansen, reviewed his medical records, and evaluated his condition for the purpose of his disability claim. (Tr. 241-44). Dr. Karri found that Christiansen had a normal gait without use of any assistive devices, and had normal or nearly normal grip strength in his hands. (Tr. 243). Dr. Karri opined that Christiansen had normal motor strength in his arms and legs, normal deep tendon reflexes, and normal sensory responses. (Tr. 243). Dr. Karri noted that Christiansen's right wrist was deformed, with a decreased range of motion, but his grip strength in his right hand was only mildly decreased. (Tr. 244).

II.    Depression/ anxiety

Christiansen alleged in his application for benefits that he suffered from depression and anxiety and that he was taking Lexapro and Seroquel for treatment. (Tr. 140).

In June 2005, Ralph Saintfort, M.D., a psychiatrist, examined Christiansen and evaluated his mental condition. (Tr. 219-21). Dr. Saintfort noted that Christiansen had no prior psychiatric history. (Tr. 219). Christiansen told Dr. Saintfort that he had been depressed over the past year due to marital and financial difficulties but was guarded about disclosing any recent drug use. (Tr. 219). Dr. Saintfort diagnosed a major depressive disorder, single, moderate, without psychotic features; polysubstance abuse in early remission; and assigned Christiansen a Global Assessment of Functioning ("GAF") of 55-60.[2]

---

[2] The GAF scale reflects a "clinician's judgment" of the individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000)(*DSM-IV-TR*"). The higher the number, the higher the level of functioning. *Id.* An overall GAF score is dependent on separate assessments of (1)

6

(Tr. 220). Dr. Saintfort recommended a regimen of anti-depressant medication and individual therapy. (Tr. 221).

In August 2005, Dr. Saintfort followed up with Christiansen for medication management and supervision. (Tr. 218). Christiansen told Dr. Saintfort that he had not taken any of the prescribed medications to manage his mood and anxiety problems because he could not afford them. (Tr. 218). Dr. Saintfort redirected Christiansen to a patient assistance program for his medications, and gave him samples of his prescribed medications. (Tr. 218). Dr. Saintfort also advised Christiansen to follow up with social services agencies for support. (Tr. 218).

In January 2006, Stephen Paul Singley, Ph.D., an examining psychologist, interviewed Christiansen and conducted a mental status evaluation. (Tr. 245-48). Dr. Singley noted that Christiansen presented with a neglected and unclean physical appearance, with a very unpleasant odor, but that it was difficult to determine whether this was due to depression or lifestyle. (Tr. 245, 247). Dr. Singley noted that his mood was reasonably neutral, with no clinical impression of significant depressive affect and he had adequate mental alertness and orientation. (Tr. 245, 247). Dr. Singley commented that Christiansen had difficulty subtracting and that his ability to recall digits was impaired. (Tr. 247). With regard to Christiansen's inability to provide meaning for common sayings,

---

symptom severity, and (2) social, occupational, and school functioning. *Id.* at 32-34. A GAF score of 61-70 reflects "some mild symptoms" or "some difficulty in social, occupational, or school functioning (e.g. occasional truancy, or theft within the household) but generally functioning pretty well." *Id.* at 34. A GAF score of 51-60 reflects "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

7

Dr. Singley stated that "intellectually and responsively he seems more capable than his denial of such knowledge would suggest" and was concerned that he might be malingering. (Tr. 247). Dr. Singley also pointed out discrepancies between Christiansen's statements that he had not abused substances such as drugs or alcohol for five years, and medical records showing more recent treatment for substance abuse. (Tr. 247). Dr. Singley diagnosed polysubstance dependence history, with prior remission, then relapses, and currently claimed in remission; a depressive disorder, with no assurance that this mood disorder was not substance generated; and borderline personality disorder. (Tr. 247). Dr. Singley assessed Christiansen's GAF score at 60, indicating a moderate degree of symptoms. (Tr. 248).

In February 2006, Russell Taylor, Ph.D., a state agency psychologist, reviewed Christiansen's medical records and assessed his mental functioning for the period through February 2006. (Tr. 251-64). Dr. Taylor identified impairments in the categories of affective disorder, personality disorder, and substance addiction disorder. (Tr. 251). In an assessment of the "B" criteria of the Listings, Dr. Taylor indicated that Christiansen had a mild restriction of activities of daily living; moderate difficulties in maintaining social functioning and maintaining concentration, persistence, and pace; and no episodes of decompensation. (Tr. 261). Dr. Taylor summarized Christiansen's mental health history and treatment, noted that he could not rule out possible malingering, and reported a normal degree of activities of daily living. (Tr. 263). On a mental functional capacity form, Dr. Taylor indicated that Christiansen had no marked limitations in any

8

areas of functioning; had moderate restrictions in carrying out detailed instructions, maintaining attention and concentration for extended periods, working in coordination with others without being distracted, completing a normal workday and week without interruptions, interacting with supervisors and co-workers, maintaining cleanliness, and setting realistic goals; and had no significant limitations in all other areas of functioning. (Tr. 281-82). In his functional capacity assessment, Dr. Taylor concluded that Christiansen retained the mental capacity to understand, remember, and carry out simple tasks, and socially, he would benefit from a less socially demanding work environment. (Tr. 283).

In February 2006, Jerrold Heinrich, Ph.D., a state agency psychologist, reviewed Christiansen's medical records, and assessed his mental functioning for the period prior to the expiration of his insured status (and thus, prior to his amended date of disability). (Tr. 267-280). Dr. Henrich concluded that the record contained insufficient evidence of mental impairment. (Tr. 267).

**ALJ Hearing**

At the January 12, 2007, ALJ hearing, Christiansen alleged that he was unable to do any type of work because of depression, anxiety, left shoulder rotator cuff tear, the residual effects of an old ankle fracture, and malunion of the right distal radius in his right wrist. (Tr. 19; 335-36). He testified that he stopped using drugs in March 2005. (Tr. 337). He claimed that his pain interfered with his ability to attend to and concentrate on simple tasks. (Tr. 343).

At the hearing, George Paprocki, the VE, responded to hypothetical questions posed from the ALJ, factoring in characteristics of a hypothetical person of Christiansen's age, education, and background. (Tr. 187-88, 351). The VE considered jobs that accommodated Christiansen's vocational profile of a young age, high school education, past relevant work experience, and a residual functional capacity (RFC) for light work activity that did not require more than occasional climbing. (Tr. 352). The VE testified that Christiansen's past jobs as a forklift driver, painter, janitor, as he performed them, and the job as a molding machine tender, as performed in the national economy, accommodated these restrictions. (Tr. 352). The VE also considered the impact of an additional restriction, that limited Christiansen's contact with others, to no more than occasional contact with the public, co-workers, and supervisors. (Tr. 352). The VE testified that the individual would be able to perform Christiansen's jobs as a forklift driver, painter, janitor, and molding machine tender. (Tr. 352).

The VE also considered restrictions to light work that did not require use of the dominant, right hand or arm, or use of the non-dominant, left arm about the head (to accommodate the alleged rotator cuff injury). (Tr. 353-54). The VE testified that all of Christiansen's past jobs required use of both hands and bilateral manual dexterity. (Tr. 353). However, the VE identified jobs as a surveillance system monitor, school bus monitor, and arcade attendant as jobs available that would accommodate the posed hypothetical restrictions. (Tr. 353-354). The VE stated that his testimony was consistent with the *Dictionary of*

*Occupational Titles*. (Tr. 356-57). The VE's testimony did not include consideration of any mental limitations.

**The ALJ Decision**

The ALJ issued his decision on September 26, 2007. In his written decision, the ALJ concluded that Christiansen was not disabled within the meaning of the Act. (Tr. 13-22).

A.   Right wrist/ ankle/ shoulder

The ALJ found that Christiansen suffered from the following severe impairments: residual effects of an old right ankle fracture and malunion of the distal right radius of the right wrist. (Tr. 15). The ALJ stated that these impairments did not meet or equal one of the listed impairments and, after consideration of the record, concluded that Christiansen had the RFC to perform light work: he could lift up to 20 pounds occasionally and up to 10 pounds frequently; he could stand/sit/walk up to 6 hours in an 8 hour work day, but was limited to occasional climbing. (Tr. 17).

The ALJ stated that he did not find that Christiansen's statements concerning the intensity, persistence, and limiting effects of these impairments to be entirely credible. (Tr. 19). Specifically, the ALJ noted in his decision that Christiansen's allegations of significant limitations due to wrist pain was inconsistent because he stated he could not lift three pounds, but Dr. Karri's objective testing indicated he retained good strength and range of motion in his left arm, and considering his work history, the ALJ concluded that Christiansen should have had no difficulty in lifting 20 pounds. (Tr. 20). In addition, the ALJ

11

stated that there was evidence that Christiansen could turn a door knob, tie his shoes, pick up a coin, maintain personal hygiene independently, perform household cleaning, and complete necessary shopping. (Tr. 16). Further, Christiansen gave inconsistent testimony regarding his drug use. (Tr. 20). The ALJ concluded that these inconsistencies reflected negatively upon his credibility. (Tr. 20).

In addition, the ALJ found that Dr. Pardubsky's report, which indicated Christiansen was unable to work in any job in the competitive workforce because he would be expected to miss four workdays per month, failed to explain why Christiansen would miss so much work and gave no reason for this opinion. (Tr. 19). The ALJ concluded that he did not give Dr. Pardubsky's opinion controlling weight because it was not well-reasoned and was not supported by objective evidence. (Tr. 19).

The ALJ concluded that the opinions of Dr. Rabinowitz and Dr. Karri were more persuasive because they were based on objective testing. (Tr. 19). The ALJ stated that their opinions support the position that Christiansen has the ability to perform light work as that term is used in the Rules and in the *Dictionary of Occupational Titles.* (Tr. 19). The ALJ noted that even if he had overestimated Christiansen's ability to use his right wrist, the VE testified that there were jobs available for a hypothetical individual who could not use his dominant hand and did not have the ability to do overhead work. (Tr. 19).

B.    Right ankle

12

Christiansen alleged disability as a result of an old ankle fracture. The ALJ concluded that there was no indication from the treatment records that this condition would prevent him from standing or walking for six hours and noted that Christiansen had been able to perform a wide range of work activities in the years since the onset of this injury. (Tr. 20). The ALJ found that while his ankle may limit his ability to lift and carry, Christiansen retained the ability to engage in work activities consistent with the above-described RFC. (Tr. 20).

C.      Shoulder

The ALJ did not find Christiansen's allegation of a left shoulder injury to be entirely credible because there was no conclusive or persuasive medical evidence to support his allegations and because Dr. Karri's objective testing indicated that he had good range of motion in that shoulder. (Tr. 16).

D.      Mental impairments

The ALJ concluded that Christiansen's allegations of anxiety and depression were not severe because they did not cause more than minimal limitation in his ability to perform basic work activities. (Tr. 16). The ALJ made his finding after considering the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments. (Tr. 16).

The ALJ reviewed the medical reports regarding Christiansen's mental impairments. Specifically, Dr. Taylor found that there was evidence of depression, a personality disorder, and a substance abuse problem, and that these symptoms would have a mild restriction in Christiansen's life. (Tr. 16). Dr.

13

Heinrich, who only reviewed evidence from before the onset date, concluded that there were no significant mental impairments. (Tr. 16). Dr. Singley concluded that Christiansen's mental status was adequate and was persuaded that his depression may be caused by his substance abuse; that his personality disorder appears to be based upon his history of noncompliance with his doctor's treatment orders; and that Christiansen demonstrated evidence of malingering behavior. (Tr. 17). The ALJ found that while Christiansen demonstrated that he may have certain underlying mental health issues, there was no persuasive objective evidence that they currently caused more than mild limitations. (Tr. 17).

## Discussion

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. *See* 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed?; (2) is the plaintiff's impairment "severe?" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of specified impairments? (20 C.F.R. Part 404, Subpart P, Appendix 1);

(4) is the plaintiff unable to perform his or her former occupation?; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps one through four. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show that the plaintiff has the ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* or to supplant the ALJ's finding with the Court's own assessment of the evidence. *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). Credibility determinations made by the ALJ will not be disturbed unless the findings are clearly erroneous. *Anderson v. Bessemer City*,

470 U.S. 564, 573 (1985); *Imani v. Heckler*, 797 F.2d 508 (7th Cir.), *cert. denied*, 479 U.S. 988 (1986).

In this case, the ALJ found that Christiansen had the RFC for work that accommodated restrictions to light work that would not require more than occasional climbing and presented such restrictions in a hypothetical posed to a VE. (Tr. 352). The ALJ did not address Christiansen's alleged depression or anxiety in his hypothetical. Based on the VE's testimony, the ALJ concluded that Christiansen could perform his past work. (Tr. 20).

In his appeal, Christiansen argues that ALJ erred in two respects. Both of these arguments will be addressed in turn.

**1.    Whether the ALJ's finding on the severity of his impairments is tainted by error and is supported by substantial evidence**

Christiansen first argues that the ALJ erred in his findings regarding the severity of his depression and anxiety**.** Specifically, Christiansen argues that the ALJ did not give weight to Dr. Taylor's opinions.

To determine whether Christiansen's depression was "severe," under step two, the ALJ stated he followed the specific procedure under the Social Security Regulations for evaluating the severity of an adult claimant's mental impairments. (Tr. 16). This procedure requires the ALJ to list the signs, symptoms, and other medical findings which substantiate the presence of one or more medically determinable mental impairments, and then to rate the degree of functional limitation resulting from such impairments. (20 CFR 404). After reviewing the medical evidence related to Christiansen's alleged depression and anxiety, the ALJ concluded that because his medically determinable mental impairments

16

"cause[d] no more than 'mild' limitation in any of the first three functional areas and 'no' limitation in the fourth area, they are nonsevere. (20 CFR 404.1520a(s)(1) and 416.920a(d)(1)." (Tr. 17).

The ALJ properly considered Christiansen's mental limitations. The ALJ evaluated Christiansen's claims against the medical evidence in the record in determining whether his impairments were severe. While the ALJ gave weight to Dr. Henreich's opinions, which related only to Christiansen's mental functioning prior to March 2003, the ALJ also relied on other evidence to assess Christiansen's mental functioning. For example, Dr. Singley found Christiansen's mood to be reasonably neutral, with no clinical impression of significant depressive affect, and an adequate mental status. (Tr. 245-48). Moreover, Dr. Singley suggested that Christiansen appeared to be malingering, based on inconsistent statements regarding his drug usage and his inability to provide meanings for common sayings. (Tr. 247).

Contrary to Christiansen's assertions, Dr. Taylor's opinions support the ALJ's conclusion that Christiansen's mental limitations are not severe. Dr. Taylor, who noted that malingering could not be ruled out, identified that Christiansen's mental impairments would cause a mild restriction daily living activities, moderate difficulties in maintaining social functioning and concentration. Further, Dr. Taylor concluded that Christiansen retained the mental capacity to understand, remember, and carry out simple tasks, and would benefit from a less socially demanding work environment. Christiansen fails to explain how Dr. Taylor's opinions preclude him from performing his past work.

17

The Court finds that the ALJ's conclusion that Christiansen's mental limitations were not severe was supported by substantial evidence.

Therefore, as the ALJ did not find that Christiansen's mental limitations were severe, he was not required to consider Christiansen's mental impairments past step two of the five-part test. Under these circumstances, and in conjunction with the ALJ's determination that all of Christiansen's allegations were not credible, the ALJ reasonably did not incorporate any mental limitations in calculating Christiansen's RFC.

**2.    Whether the ALJ erred by failing to develop the record of treating source opinion evidence**

Christiansen next argues that the ALJ erred by failing to give proper weight to Dr. Pardubsky's opinions. Christiansen further argues that it was error to discount Dr. Pardubsky's opinion regarding Christiansen's likelihood of missing work because Dr. Pardubsky failed to provide his rationale and Christiansen asserts that the ALJ had a duty to develop the record surrounding this opinion.

In his decision, the ALJ explained that, while he gave weight to Dr. Pardubsky's opinion that Christiansen had abilities consistent with light work restrictions, he rejected the doctor's opinion that Christiansen would miss more than four days of work per month, and that Christiansen could not use his right hand and arm for significant portions of the work day. (Tr. 19). The ALJ reasoned that Dr. Pardubsky did not explain why he believed Christiansen would miss so much work or why Christiansen would have such extreme limitations in his right hand and arm. (Tr. 19). The ALJ explained that neither Dr. Karri nor Dr.

Rabinowitz, who used objective testing, had found such extreme limitations in Christiansen's functioning. (Tr. 19).

Dr. Pardubsky appeared to base his opinions on Christiansen's subjective complaints rather than any objective test findings. Medical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints. *Rice v. Barnhart,* 384 F.3d 363, 371 (7th Cir. 2004). An ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations. *Dixon v. Massanari,* 270 F.3d 1171, 1178 (7th Cir. 2001). The Court finds that the ALJ properly rejected Dr. Pardubsky's opinions because they were not supported by objective evidence and appeared to be based on Christiansen's subjective complaints, especially because the ALJ found that Christiansen was not entirely credible. Further, the Court finds that the ALJ's conclusion regarding Christiansen's RFC was supported by substantial evidence.

## CONCLUSION

For the reasons set forth above, Christiansen's Motion for Summary Judgment [#10] is DENIED, and the Commissioner's Motion to Affirm [#11] is GRANTED.

ENTERED this 13th day of March, 2009.

/s Michael M. Mihm_____
Michael M. Mihm
United States District Judge